UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No. 1:11-cv-547

ESTATE OF CAPTAIN DAVID JOHNPAUL THOMPSON,
by and through EMILY THOMPSON, Executor; CHIEF
WARRANT OFFICER THOMAS RUSSELL and TINA
RUSSELL, Individually and as Parents and Next Friends of
their Minor Children, SKR, ATR and ARR; and ESTATE OF
SPECIALIST MARC P. DECOTEAU, by and through
MARK DECOTEAU, Executor,

                                        Plaintiffs,

v.

MISSION ESSENTIAL PERSONNEL, LLC,

                                        Defendant.

## **COMPLAINT AND DEMAND FOR TRIAL BY JURY**

### **NATURE OF THE CASE**

1.      This civil action for wrongful death, severe and permanent personal injuries and

punitive damages, arises out of the shooting of two unarmed United States Army Special Forces

Officers and an unarmed Specialist inside their large, well-protected base in Afghanistan by an

unstable, substandard and disgruntled linguist employed by a U.S. military contractor.  In direct

and, in some instances, egregious, violation of its contract with the military, the contractor failed

to properly vet, prepare, place and manage the linguist. When his substandard performance was

ultimately addressed by the military, the linguist obtained a firearm from a fellow employee –

who, like the disgruntled linguist, was contractually prohibited from being armed – and shot the

soldiers, killing two and permanently injuring the third.

## THE PARTIES

2.      Plaintiff Emily Thompson is the widow and executor of the Estate of her late husband, United States Army Special Forces Captain David Johnpaul ("Jp") Thompson, and the mother of their minor children, IRT and ACT.  Emily Thompson has been appointed the lawful personal representative of her late husband's Estate, approved through an estate administration in Moore County, State of North Carolina, Superior Court Division, File No. 10 E 144.  Emily Thompson resides with her daughters in Whispering Pines, Moore County, North Carolina.

3.      Plaintiff Chief Warrant Officer Thomas Russell is an active duty soldier in the United States Army Special Forces based at Fort Bragg, North Carolina.  He is the father of the minor child, SKR, and, together with his wife, Plaintiff Tina Russell, is the father of their minor children ATR and ARR.   They reside in Sanford, Lee County, North Carolina.

4.      Plaintiff Mark Decoteau is the father, and his wife, Nancy Decoteau, is the mother, of United States Army Specialist Marc P. Decoteau.  Mark Decoteau is the executor of his late son's Estate and has been appointed the lawful personal representative of that Estate, approved through an ancillary administration in Moore County, State of North Carolina, Superior Court Division, File No. 11 E 437.  Mark and Nancy Decoteau reside in Waterville Valley, Grafton County, New Hampshire.

5.      Defendant Mission Essential Personnel, LLC ("MEP") is a corporation organized and existing under the laws of the State of Ohio which conducts business and maintains offices in North Carolina and elsewhere.  MEP is a global services company with approximately 8,200 employees and, among other things, recruits, vets, prepares, places and manages linguists, translators and interpreters and related program support for corporate and government clients.

## JURISDICTION

6.      This Court has original jurisdiction over this action in accordance with 28 U.S.C.

§§ 1331 and 1332 insofar as the claims each far exceed the minimum amount in controversy, the

Plaintiffs and Defendant are citizens of different States and substantial federal issues are

presented.

## BACKGROUND

7.      In September 2007, Mission Essential Personnel obtained what would eventually

become a $1.985 billion contract (No. W911W4-07-D-0010) with the Intelligence and Security

Command ("INSCOM") of the United States Army to recruit, provide and manage pre-screened,

skilled contract linguists for ongoing operations in Afghanistan.

8.      Under that contract, in August 2009, MEP hired Nasir Ahmad Ahmadi, a 22-year

old native of Afghanistan and recent emigrant to the United States, as a translator.  A Pashtun,

Ahmadi had been raised in Helmand Province before moving to Kabul in his teens.  He spoke

primarily Pashto, but growing up had learned Dari and some English.  In Kabul, Ahmadi spent

most of his teen years as a street vendor selling small items like oils and soaps in an open market.

9.      In 2004, Ahmadi obtained a job with an international development firm funded, in

part, by USAID.  Ahmadi worked on translations for a civilian construction project in Helmand

for three months, during which time he met various military personnel, including soldiers in the

U.S. Special Forces.  Ahmadi eventually was hired as a local interpreter for various U.S. and

foreign military units, including special forces detachments.  He moved from one unit to another

and was generally considered a poor field interpreter.  Even accounting for his youth, he lacked

an authoritative, mature, commanding presence, and that posed a serious problem for soldiers working to inspire confidence and gain cooperation from local Afghan leaders.

10.     Ahmadi's language skills were considered mediocre, and he was prone to loose, imprecise, improvised interpretations.  He was characterized as a sloppy, lazy, unhygienic and untrustworthy loner, who often disappeared when work needed to be done.  Apparently having learned that Afghans who attained U.S. residency were paid over ten times the typical annual salary of most local interpreters, Ahmadi sought out an opportunity to emigrate to the U.S.

11.     In early 2009, Ahmadi contacted a linguist from Kabul whom he had known for five years, and who had since moved to the United States.  On Ahmadi's behalf, that Kabul contact, who was then living in Virginia, agreed to enlist the help of two other Afghan nationals, also living in Virginia.  One was a former MEP interpreter and the other was working for MEP at the time.  In the spring of 2009, Ahmadi emigrated to the U.S. and, by June, had signed a lease with the two interpreters in Reston, Virginia.  With help from his Kabul contact and his new Reston roommates, Ahmadi obtained a driver's permit, a social security number, a U.S. Permanent Resident card and, after his Kabul contact taught him to drive, a Virginia driver's license.

12.     Ahmadi's Kabul contact, who had worked loyally with U.S. military interests for years, was somewhat concerned upon reuniting with Ahmadi because he seemed quite changed since they had last seen one another in 2006.  Ahmadi appeared deeply depressed, unhealthy and unstable.  He seemed even more of a loner than he had been in Afghanistan and was easily provoked, irritable and prone to unreasonable arguing and complaining.  When his Kabul contact

-4-

tried to teach him to drive his Toyota, Ahmadi became so enraged at the instructions that he slammed on the brakes and declared that he would "crash the car" if the instruction did not stop.

13.     The experiences of Ahmadi's roommates, who had also both served loyally with U.S. military interests for years, were also unnerving.  Ahmadi was a strange, difficult roommate. He was unkempt in his living habits, yet spent literally hours each day in the shower.  Over the course of a single week, he would vacillate from practicing traditional Muslim values – fasting, abstaining from women and alcohol, keeping salat – to frequenting topless bars, drinking alcohol and dancing with women in clubs.  Ahmadi angered easily and once became enraged with one of his roommates just for borrowing his shoes to play basketball.  According to the Kabul contact, Ahmadi was just "not right, psychologically" and was repeatedly seen "talking to himself."

14.     Between June and August 2009, Ahmadi applied for several jobs including a position with MEP as a linguist who spoke Pashto and Dari.  In his MEP employment application, Ahmadi listed not only his two roommates as persons in the U.S. whom MEP could contact, but also his Kabul contact who was then living in Virginia.  The Kabul contact was also known personally to at least one MEP recruiter who specialized in hiring speakers of Pashto and Dari.  Despite actual knowledge of the identities and contact information of persons who knew Ahmadi personally, no one from MEP contacted any of the three references to ask any questions about Ahmadi's suitability for returning to service as an interpreter in Afghanistan.  Moreover, the residence of Ahmadi and his two roommates in Reston Virginia was just ten miles away from the "National Capital Region Office" of Defendant MEP.

## CAMP NUNEZ

15.     Nasir Ahmadi was hired by MEP in August 2009 and, by early September, he had

been returned to Afghanistan and was living in MEP housing at Bagram Airfield ("Bagram" or

"BAF").  One specific, stated desire that Ahmadi had made to MEP in his employment papers

about possible job assignments was that he did ***not*** wish to serve with any Special Forces units.

Yet, by mid-September, less than a month after MEP hired him, that is exactly where MEP

allowed him to be assigned.

16.     By September 2009, the U.S. and Afghan military presence in the Sayed Abad

District of Wardak Province, 30 miles from Kabul, was significant and well-established.  A

company of 10th Mountain Division soldiers was based there and, together with support and

contractor employees, totaled over 400 personnel.  Their base was over a mile in circumference

and was so large that, besides the 10th Mountain units, it also housed the offices of the District

Sub-Governor and other Afghan administrative and residential buildings in its East Quarter.

17.     Directly across the road to the south were training companies of the Afghan

National Police and Afghan National Army that included another 350 or more soldiers, police

officers, staff and trainees.  In one corner of the Sayed Abad base was FB Nunez, a sequestered

enclosure originally established in mid-2009 by a U.S. Special Forces ("SF") Operational

Detachment Alpha ("ODA" or "Detachment").  That ODA was led by Captain David "Jp"

Thompson and the team's second-in-command, Chief Warrant Officer Thomas W. Russell of the

3rd Special Forces Group (Airborne) headquartered at Fort Bragg, North Carolina and then

operating from Bagram.

18.     After establishing Nunez, in August 2009, the 3rd Group ODA returned to the U.S. after being relieved in place by an ODA of the 20th SFG(A), one of the two Army National Guard Special Forces Groups.  By that time, with its 12-member SF detachment, augmented with Psychological Operations and Civil Affairs teams, electronic signals personnel, their interpreters and a contingent of U.S. Navy Seabees, Camp Nunez alone totaled another 50 personnel in addition to the 750 or more other U.S. and Afghan personnel based at Sayed Abad.  When the 3rd Group ODA departed in August 2009, they left in place a group of interpreters that included two Afghan brothers employed by MEP as Category I (no security clearance) interpreters and an Afghan-American who had been a thirty-year resident of California and was employed by MEP as a Category II (security clearance) interpreter.

19.     Shortly after the 20th Group ODA took over, its Senior Communications (18E) Sergeant was assigned the monthly task of replenishing the team's cash allotment and supplies at Bagram and was informed that the team would be assigned another interpreter.  The 18E Sergeant set about interviewing a series of MEP interpreters to determine who was most suited for the team's needs and, ultimately, selected Nasir Ahmadi because he was, by far, the youngest among the group of otherwise 60-year-old Afghans.  Not long after the 18E Sergeant and Ahmadi arrived back at Nunez, the Detachment's Operations Team Sergeant received an e-mail upbraiding the team for interviewing the MEP interpreters.  It was apparent to the ODA that an MEP manager at BAF had complained that the interpreters had already been "completely vetted" by MEP, so there was no need for individual units to evaluate its personnel before assignment.

20.     Ahmadi proved to be a problem.  Early on, he accompanied the Detachment Commander and other soldiers into the field to meet with local village leaders.  More than one soldier spoke enough Dari to discover that, as an interpreter, Ahmadi was timid, lacking in confidence and ad libbed the team's exchanges with the Afghans.  Thereafter, Ahmadi was assigned to serve only as a "camp interpreter," working mostly with the Senior Engineering Sergeant to interpret with the nine local builders, laborers and cooks living at Nunez.

21.     In this capacity, Ahmadi worked solely inside the large, well-protected and secure confines of the U.S. base and was not involved in any active combat operations.  In fact, while the 20th Group and 3rd Group had other areas of responsibility that saw considerable combat, the U.S. base at Sayed Abad in 2009 and 2010 was not one of them.  At no time while Ahmadi was employed by MEP at Nunez did the base even come under small arms fire, much less any other type of concerted enemy attack.  The primary role of the soldiers and contractors at the base was to recruit and train Afghans for the Afghan National Police and the Afghan National Army and to build and maintain facilities for that purpose.  As "camp interpreter," Ahmadi's activities were neither necessary to, nor in direct connection with, any actual hostilities but, rather, were in support of training and rebuilding efforts to establish, educate and assist the ANP and ANA.

22.     However, even in the role of camp interpreter, Ahmadi was a problem.  He did not socialize with, or get along with, the team's other interpreters or local workers.  Rather than eat in the Dining Hall or in a group with the others, against regulations, he would cook alone in his room and leave food scraps and dirty cooking utensils all over, contributing to a persistent rodent infestation.  Against regulations and specific instructions, he repeatedly took the keys to one of

the pick-up trucks assigned for use with the local Afghanistan Public Protection Force ("AP3")

which the team was establishing and training.  He used the trucks to drive out of Nunez and

across the larger 10th Mountain part of the base, where he spent most of his time avoiding work.

23.     Also against base rules, and at least as disturbing, is that Ahmadi was sometimes

found to be "spaced out" on naswar or "nass," a banned, highly addictive substance used across

southern Afghanistan.  Nass is a form of snuff comprised of tobacco cut with paint thinner, and it

is sometimes mixed with powdered hashish.  Ahmadi's nickname – "Nas" – was not merely a

foreshortened first name, but also a reference to his use of "nass."  Ahmadi had admitted to team

members that he smoked hashish and, at one point, had been suspected of breaking into the

Detachment's medical supply to steal narcotics.

### DECEMBER 2009 - JANUARY 2010

24.     By December 2009, the difficulties with Ahmadi had grown even worse.  His

erratic shifts from traditional Muslim values to forbidden practices escalated.  He was angry

when his impulsive notion to raise money from other interpreters to build a mosque and pay for a

new well was met with derision.  Beyond fasting and reading the Koran, he was found studying

religious texts about death, dying and the afterlife.  Some of his writings indicated that he wanted

to die.

25.     Yet, just as frequently and especially on Thursday nights, he brought young, local

Afghan laborers and boys through the 10th Mountain part of the base into Nunez and to his bunk

room, another expressly forbidden practice.  Just as he had been instructed to stop taking the AP3

trucks, he was warned more than once to stop driving outsiders back into Nunez.  In December,

after a fellow MEP interpreter mocked and chastised him for such behavior, Ahmadi told a gathering of other MEP interpreters that if it did not stop, he would kill both the teaser and then himself with an axe.  In fact, soon after, a contraband axe was found in Ahmadi's bunk-room.

26.     Finally, near the end of the 20th Group's rotation, Ahmadi twice approached one of the other MEP interpreters at Nunez asking to borrow his assault rifle, supposedly to train at the firing range.  That interpreter did not want to lend the rifle to Ahmadi in part because, in his view, Ahmadi had been acting strangely, was untrustworthy and had no need for weapons training.  The interpreter mentioned the unusual requests to the 20th Group's Team Sergeant, who told him that he was right to have declined and, in turn, discussed it with the team's Intelligence Sergeant, who decided he would discuss their concerns about Ahmadi with the incoming team.

27.     In January 2010, Jp Thompson's and Tom Russell's Detachment was scheduled to relieve the 20th Group ODA at Nunez to carry on and, eventually, hand over to Afghans the AP3 initiative they had started in the year before.  The 3rd Group's Team Sergeant arrived on January 17, 2010, in advance of other team members and was briefed by the 20th Group's Team Sergeant and others on the status of the interpreters.  What he learned about Ahmadi was troubling.

28.     The 3rd Group's Team Sergeant had worked with three of the five interpreters at Nunez on his two prior rotations, but he was inheriting Ahmadi anew from the 20th Group ODA. After learning of Ahmadi's reputation, violations of facility rules and strange behavior, he asked where the contractor stood on Ahmadi.  He learned that no MEP Site Manager had ever visited or checked on Ahmadi or any of the other MEP interpreters at Nunez at any time since before he had left Sayed Abad six months earlier.  In fact, the only interaction the 20th Group had ever had

with any linguist site managers was during a large, multi-unit MEDCAP (Medical Civic Assistance Program) for district villages in September or October 2009 and even then, no MEP supervisors appeared at the MEDCAP to inquire about the MEP personnel working out of Nunez.

29.     Like most special operations forces trained to operate autonomously, Special Forces soldiers tend not to complain about unsatisfactory resources in the field.  While not conversant with the details of MEP's contract, the soldiers knew that they could not terminate a sub-standard contractor employee, but could only arrange for his administrative transfer.  After six months of problems with Ahmadi, and with no MEP management in sight, the leaders of the 20th Group and the 3rd Group ODAs discussed how to best resolve the issue of Nasir Ahmadi.

30.     Captain Thompson arrived back at Nunez from the U.S. on January 21, 2010 and, by January 22, 2010, had already discussed with the Team Sergeant and others that Ahmadi should be transferred back to Bagram on the Ring Flight scheduled for Saturday, January 30, 2010.  The Team Sergeant told two of the other MEP interpreters who he had known from prior rotations that Ahmadi would soon be transferred and asked them to keep an eye on him.

31.     Just after lunch on Friday, January 29, 2010, the Team Sergeant and others from the 3rd Group Detachment conducted one of the camp's regular Health and Welfare Inspections of all bunk rooms in Nunez.  As expected, they found Ahmadi's room to be filthy, with five or six dirty pots and frying pans laying about, rotting food and rat feces on the desk and floor, human feces smeared on the wall and dirty clothing and dishes strewn everywhere.  The Team Sergeant took this opportunity to confront Ahmadi and inform him that he was being transferred off Nunez

to FOB Airborne and back to BAF for reassignment.  Ahmadi was defensive and complained that only MEP could fire him.  The Team Sergeant curtly explained that he was not being fired, but he was being transferred and he would be leaving on the Ring Flight in the morning.

32.     One of Ahmadi's last comments to the Team Sergeant was that he would be calling his employer, MEP, about the situation.  Investigation later determined that, shortly thereafter, Ahmadi entered the unsecured bunk room of one of the other MEP interpreters – the second of the two whom the 3rd Group had inherited – and took from that bunk room an AK-47 assault rifle and three thirty-round clips of ammunition.  Under MEP's contract and applicable regulations, none of the MEP employees was trained for, or authorized to possess, such weapons, much less permitted to leave them entirely unsecured in an unlocked bunk-room.

33.     Shortly after 4:00 PM local time, Capt. Thompson and Chief Russell were working together in a side-office of the team's Tactical Operations Center ("OPCEN") across from the dining hall and the twin hallways that led to the bunk rooms.  Most other team members were occupied with equipment inventory or learning about a new generator a few buildings away.  In the OPCEN's outer room was a Civil Affairs Sergeant.  In a bunk room one building over, a group of MEP interpreters, including a local interpreter nick-named "Harry," were playing cards.  Tactical PSYOPS Team Specialist Marc Decoteau had just left his bunk room and was exiting Hallway No. 2 when, from the cover of the long, dark hallway, Nasir Ahmadi fired a series of bursts from the AK-47, hitting Marc ten times in the back, both arms and the head, killing him.

34.     Hearing shots too loud and close to the OPCEN to have been from the firing range, Capt. Thompson and Chief Russell immediately left the side-office and headed for the

OPCEN Entrance/Exit.  Like many of the soldiers inside the secure confines of their internal

Special Forces base which, itself, was inside the guarded perimeter of COP Sayed Abad, few of

these soldiers carried weapons inside the base.  None of the SF soldiers in the side-office were

armed at the time and, despite this, their initial reaction was to head toward, rather than away

from, the source of the unexpected gunfire inside their base.

 35. Meanwhile, the other MEP interpreters ran from their bunk house to find Ahmadi

with an AK-47 raised to his shoulder and headed toward the OPCEN.  Just as Ahmadi heard and

turned toward them, Jp Thompson and Tom Russell burst open the OPCEN door.  Ahmadi

immediately opened fire, hitting Jp twice in his lower chest.  Another round struck Tom Russell,

passing through his hand, shattering his wrist watch and sending shrapnel into his face.  The

shots knocked Jp and Tom back into the OPCEN behind its closed door and onto the floor.

 36. As Ahmadi ran to pull the door open again, soldiers from around the base ran to

get their weapons and headed for the OPCEN.  Ahmadi moved forward, yanked open the door,

stepped over the still conscious but gasping Jp Thompson and fired again, point blank, at Tom

Russell, hitting him in both legs.  As Ahmadi stepped further into the OPCEN with the rifle

raised to kill Tom, the Civil Affairs Sergeant had a clear shot and fired five rounds from his 9mm

sidearm, hitting Ahmadi in the head and dropping him immediately to the floor.

 37. Despite his injuries, Chief Russell took immediate charge.  He ordered one soldier

forward to cover Ahmadi, told others in the OPCEN to call for a medic and had a third soldier

flex-cuff Ahmadi, though it was soon apparent that Ahmadi was dead.  Meanwhile, the ODA's

medic arrived and commenced treatment on Jp Thompson.  Medics and the battalion surgeon

from the 10th Mountain Division also arrived to assist.  A helicopter arrived from FOB Shank

within about 35 minutes and Chief Russell and Capt. Thompson were carried out by stretcher.  It

was not until after the helicopter landed that Tom Russell allowed anyone to administer

morphine to him.  At that point he turned over command of Nunez to his Team Sergeant.  For

much of the flight to FOB Shank, Tom watched as the medics tried to save his friend's life.

Despite all efforts, upon arrival at the FOB Shank hospital, Jp Thompson was declared dead.

## MEP'S CONTRACT

38.    In September 2007, MEP was awarded a $700+ million, five-year contract

(Contract No. W911W4-07-D-0010) with the U.S. Army's Intelligence and Security Command

("INSCOM"), a contract that would eventually cost over $1.985 *billion*.  The Request For

Proposal stated that the contract was needed to provide and manage pre-screened, skilled contract

linguists for Operation Enduring Freedom-Afghanistan.  The Contract's Statement of Work set

forth specific terms that MEP was required to meet.  MEP failed to comply with – and in several

instances knowingly violated – many of those terms.

39.    Under Section 2.0 ("Program Management") of its contract, MEP's senior

management was responsible for the proper execution of all provisions of the contract from

Recruitment through Deployment, On-Site Management and Quality Control.  In the U.S.,

throughout most of 2009, the responsibility and monitoring of contract compliance fell to MEP's

then Senior Vice President Marc D. Peltier who, in September 2009, became MEP's Chief

Operating Officer.  On a regular basis, Mr. Peltier conferred and interacted with INSCOM's

civilian Deputy Program Manager and Contracting Officer's Representative ("COR").

Ultimately, addressing the various failures to comply with contract requirements, from pre-screening through quality control, was largely the responsibility of Mr. Peltier and his immediate subordinates.  On behalf of INSCOM, under the contract, only the Contracting Officer or the COR was authorized to approve changes to the terms of MEP's contract.

40.     Under Section 2.1.2 ("Contractor Pre-Screening") of its contract, MEP was required to recruit suitable linguist candidates who spoke, among other languages, "Pashtu" and Dari (a/k/a Persian-Afghan).  Once identified, and after the candidate completed the necessary MEP employment application and a Standard Form 85P Security Questionnaire, MEP was required to initiate a thorough pre-screening process that included a General Skills Review § 2.1.2.1).  Two requirements of that review are that candidates were required to have "Familiarity with and [maintain] adherence to standards of conduct as prescribed by U.S. Army instructions, this contract, and laws of host nation(s) in performing work assignments; [and be] ***willing*** and able to live and work in harsh (to include combat) environments" (emphasis supplied).

41.     After Ahmadi expressly stated in his MEP employment paperwork that he did ***not*** wish to serve with Special Forces units – a wish, no doubt, based on his own past experiences – MEP violated § 2.1.2.1 of its contract in assigning him, or providing him to the military for assignment, to work directly with a Special Forces unit.  Moreover, MEP failed to properly train Ahmadi because, once so engaged, he repeatedly displayed a complete lack of "familiarity with and adherence" to the rules, regulations and standards of conduct, both of the U.S. Army at Nunez, and of the contract.

42.     Under Section 2.1.2.3 ("Security Review"), MEP's contract provided that "[t]he Contractor shall conduct a security review for each employee" the results of which "shall be documented in a Security Questionnaire (Standard Form (SF) 85P, or 86 as appropriate] [and] ... Only the names of the candidates that have a reasonable probability of obtaining the level of security clearance necessary for the position ... shall be submitted to the Government.  The security review shall address at a minimum, the following basic areas: ... • Illegal use, possession, or distribution of narcotics or other controlled substances."

43.     There is no indication that MEP conducted any form of security review for Nasir Ahmadi.  MEP asked for, but then failed to contact, any of the references whom Ahmadi had listed in his MEP employment application.  Likewise, it does not appear that MEP conducted regular, standard and commonly available drug tests, such as the minimum required "tests ... for current usage of narcotics and illegal drugs" set forth in § 2.1.2.4.3(f) of its contract.  Otherwise, MEP would likely have discovered Ahmadi's ongoing nass and hashish possession and use.

44.     Under Section 2.1.2.4 ("Medical Requirements"), MEP's contract required that "[a]ll personnel deploying to an AOR [Area of Responsibility] ... shall be medically and *psychologically* fit for deployment and for performance of their contracted duties" (emphasis supplied).  Had MEP looked into Ahmadi's background or interviewed his identified points of contact in the U.S., then MEP would have learned that he was considered abnormal, exhibited symptoms of mental disorders and, according to at least one reference, was just "not right, psychologically."  Whatever other evaluations were completed by MEP, it was a violation of its contract to fail to conduct any form of genuine psychological evaluation, and, had MEP done so,

it would have discovered that Ahmadi was neither willing, nor psychologically fit, to be assigned to return to Afghanistan to perform interpreter duties for a Special Forces unit.

45.     Under Section 2.2 ("Deployment"), MEP's contract required that the Contractor take steps to ensure contract compliance during the deployment of its employees.  For example, under § 2.2, the Contractor was required to take steps to ensure that: "[a]ll personnel adhere to the standards of conduct established by the operational or unit commander; [a]ll personnel are briefed on adherence to all laws and regulations of the host nation(s); ... [and] Contractor personnel may NOT possess weapons in the AOR unless authorization is obtained pursuant to DFARS 252.225-7040."  Under its contract, in order for MEP interpreters to lawfully possess weapons in Afghanistan, MEP was first required to secure a company Operator's License from the Islamic Republic of Afghanistan.  MEP had obtained no such license.

46.     Also under Section 2.2, under DFARS 252.225-7040 and/or similar regulations, individual interpreters employed by MEP could only possess weapons if both the Contracting Officer and the Unit Commander authorized that specific employee to be armed and, then, only after the contractor ensured that such possession was otherwise lawful and that the employee had been thoroughly trained.  MEP interpreters in Afghanistan had no Arming Packets and were simply not authorized to possess weapons.  In fact, in February 2010, shortly after the incident, an MEP Site Manager required the remaining Nunez interpreters to sign a statement specifically acknowledging that they were not permitted to carry weapons.

47.     Nasir Ahmadi would never have had access to a fellow MEP's assault rifle if MEP had properly trained, monitored and managed its employees to ensure that they remained in

compliance with the contract requirements.  The soldiers to whom the MEP interpreters are

assigned were simply not versed in the details of each company's contract and licensure.  The

Plaintiffs raise no question about any decisions of the military relating to the incident.  MEP's

contract, however, required that MEP, not the soldiers with whom its employees were working,

was responsible for either obtaining the necessary licences and authority for its employees to

possess weapons or, alternatively, to take all reasonable management steps necessary to ensure

that its employees did not unlawfully possess weapons.  MEP had actual knowledge that some of

its employees were armed in direct violation of its contract and not only failed to take any steps

to correct the violations, but through fraudulent evaluations, reports and misrepresentations,

sought to keep such information from being discovered by the Army's Contracting Officer and

his Representatives.  In this respect and others, MEP's violations of its contract were egregious,

fraudulent, malicious and in conscious, willful or wanton disregard for the security and safety of

the soldiers to whom MEP personnel were assigned.

48.      Section 2.4 ("On-Site Management") of MEP's contract provided that: "the

contractor shall provide on-site managers that ... possess skills necessary to interact with military

officials.  On-site managers shall use the U.S. Army Civilian Tracking System program, or like

database as directed by the government, for accountability of all deployed personnel in support of

military operations ....  The Contractor shall ensure that field sites have as part of their on-site

management teams at least one staff member with a security clearance level equal to or higher

than the linguists working in their region of responsibility."

49.     Despite these on-site management requirements, MEP provided no on-site management for Nunez and, if there was ever any MEP management presence elsewhere at Sayed Abad for the dozen or more MEP interpreters stationed with the 10th Mountain Division units, it was never apparent to the soldiers at Nunez.  No MEP Regional Manager was known to have ever visited Sayed Abad before the shootings.  Aside from MEP's operations base at BAF, perhaps the nearest MEP Linguist Site Managers were based at FOB Shank in Logar Province or at Camp Eggers in Kabul.  None of those relatively nearby Site Managers, nor any of their predecessors, were tasked to be responsible for the MEP interpreters at Nunez.

50.     Under the contract, MEP site managers were required to provide operational, administrative and management oversight to all MEP linguists in their assigned areas, to communicate problems and concerns about linguists to MEP's Regional Manager, to see that the health, morale and welfare needs of linguists were met and to ensure that linguists adhered to established regulations and standards of conduct as required by the Contract and its Statement of Work.  Had any of these MEP Site Managers simply visited Nunez even once in the second half of 2009, they would have learned not only that most of the MEP linguists there possessed weapons without proper authorization and in violation of MEP's contract, but also that Nasir Ahmadi, in particular, had been a problem from the start and needed to be terminated or, at least, reassigned away from work with Special Forces.  In this respect, too, MEP's violations of its Contract were egregious, fraudulent, malicious and in conscious, willful or wanton disregard or indifference for the security and safety of the soldiers to whom MEP personnel were assigned.

-19-

51.     Under Section 2.5.1 ("Quality Control") of its contract, MEP was required to "develop and document a quality control plan ... that identifies potential and actual problem areas.  The Contractor [was required to] implement a complete quality control program that identifies potential and actual problem areas ... and the results of corrective actions taken throughout the life of the contract.  The basic tenet of the plan is that the Contractor is responsible for quality [and] [a]ll methods, policies, procedures, and forms shall support this concept."

52.     MEP's contract also called for a quality control "inspection system to cover all services."   The plan was required to "specify areas to be inspected on both a scheduled or unscheduled basis and the titles/positions of the individuals ... that will be responsible for inspection."  Moreover, the contract called for MEP to submit Daily and Monthly Status Reports, which were to highlight areas of concerns or problems in the contract.  Whatever quality control inspections and reports were conducted or filed under MEP's contracts, they included no truthful evaluation of Nasir Ahmadi or of any of the other MEP interpreters located at Nunez, because no MEP supervisor or manager ever actually inspected, evaluated or could have truthfully reported on, the concerns and problems there.  In this respect, too, MEP's violations of its Contract were egregious, fraudulent, malicious and in conscious, willful or wanton disregard or indifference for the security and safety of the soldiers to whom MEP personnel were assigned.

53.     In these and in other ways, the Defendant MEP was negligent, grossly negligent, reckless, fraudulent, malicious and in conscious, willful and/or wanton disregard or indifference for the rights, safety and security of others and in repeated, direct violations of its contract with

the military.  By 2010, MEP was no longer a "small business," one basis upon which it had been awarded the contract in 2007.  The $20.5 million in revenue that MEP claimed it managed in 2006 reportedly rose over 1700% to $375.5 million by 2010.  By December 2009, MEP had been "managing" the contract for its linguists for over two years and had, or reasonably should have had, in place the policies, procedures, resources, managers and quality control measures required by its contract.  In failing to have such required mechanisms in place, MEP was negligent and in violation of contract.  As a result, the soldiers at Nunez were shot and two of them were killed.

54.     Prior to the commencement of this action and in accordance with the expectations of L.R. 16.1(b), 16.4 and  83.9a-g of this Court, Plaintiffs provided ample advance notice to Defendant MEP of the Plaintiffs' claims and the facts upon which those claims are based.  More specifically, prior to filing this civil action, the Plaintiffs sent a detailed letter to MEP's Chief Executive Officer, Chris Taylor, setting forth the details above.

## COUNT I:  NEGLIGENCE

55.     Plaintiffs incorporate and reassert ¶¶ 1-54 above as if set forth fully herein.

56.     Defendant MEP owed a duty of reasonable care to the soldiers for whom, under its contract, it was contractually obliged to provide linguist services, training and management.

57.     As set forth in detail above, Defendant MEP breached its duties of reasonable care owed to the Plaintiffs and/or the Plaintiffs' decedents and, in such breaches, committed or engaged in negligent acts and/or omissions in the performance of its contract.

58.     As a proximate result of the Defendant's breaches of duty, Plaintiffs' decedents, Jp Thompson and Marc Decoteau, suffered grievous injuries of body and mind as well as pain

and suffering, all of which led to their deaths, and Plaintiff Thomas Russell suffered grievous and permanent injuries of body and mind, long-term medical treatment, lost wages and reduced earning capacity, and long-term pain and suffering.  In the case of Jp Thompson and Marc Decoteau, their families have been deprived of their love, services, protection, care, assistance, society, comfort, companionship, guidance, counsel, advice and financial assistance.  Their families have incurred expenses related to their funerals, burials and other losses and expenses related to their deaths, and their next of kin and estates have been deprived of the economic value of their capacities to earn money during the normal span of their lives.

WHEREFORE, the Plaintiffs pray that judgment be entered against the Defendant in amounts that will fairly and adequately compensate the Plaintiffs and, as appropriate, their decedents' next of kin, for all of their losses and award all other recoverable damages together with interest, costs, attorneys' fees and such other relief as may be appropriate.

## <u>COUNT II:  BREACH OF CONTRACT</u>

59. Plaintiffs incorporate and reassert ¶¶ 1-58 above as if set forth fully herein.

60. As set forth in detail above, the Defendant violated and/or failed to comply with various requirements of its contract with the military and, in so doing, breached its contract.  The Plaintiffs' decedents and Thomas Russell were direct and intended beneficiaries of MEP's contract with the military.

61. As a proximate result of the Defendant's breaches of its contract, Plaintiffs' decedents, Jp Thompson and Marc Decoteau, suffered grievous injuries of body and mind as well as pain and suffering, all of which led to their deaths, and Plaintiff Thomas Russell suffered

grievous and permanent injuries of body and mind, long-term medical treatment, lost wages and

reduced earning capacity, and long-term pain and suffering.  In the case of Jp Thompson and

Marc Decoteau, their families have been deprived of their love, services, protection, care,

assistance, society, comfort, companionship, guidance, counsel, advice and financial assistance.

Their families have incurred expenses related to their funerals, burials and other losses and

expenses related to their deaths, and their next of kin and estates have been deprived of the

economic value of their capacities to earn money during the normal span of their lives.

WHEREFORE, the Plaintiffs pray that judgment be entered against the Defendant in

amounts that will fairly and adequately compensate the Plaintiffs and, as appropriate, their

decedents' next of kin, for all of their losses and award all other recoverable damages together

with interest, costs, attorneys' fees and such other relief as may be appropriate.

### COUNT III:  WRONGFUL DEATH - COMPENSATORY DAMAGES

62.     Plaintiffs incorporate and reassert ¶¶ 1-61 above as if set forth fully herein.

63.     As set forth in detail above, the Defendant engaged in acts and/or omissions that

constituted negligence, violations of its contract with the military and other wrongful acts that

subject it to liability for compensatory and nominal damages under the North Carolina wrongful

death statute,  North Carolina Wrongful Death Act, N.C. Gen. Stat. § 28A-18-2, *et seq.*

64.     To the extent not already fully asserted above, Plaintiff Emily Thompson, on

behalf of the beneficiaries and estate of her husband, and Plaintiff Mark Decoteau, on behalf of

the beneficiaries and estate of his son, hereby seek recovery of all compensatory damages

recoverable under the North Carolina Wrongful Death Statute, including, but not limited to: all

expenses for the care, treatment and hospitalization incident to the injuries resulting in death; compensation for pain and suffering of each decedent; and all reasonable funeral and memorial expenses.  Plaintiffs Thompson and Decoteau further seek recovery of the present monetary value of each decedent to those entitled to receive such damages, including, but not limited to compensation for the loss of: the reasonably expected net income of the decedent; and the services, protection, care and assistance of the decedent; and the society, companionship, comfort, guidance, kindly offices and advice of each decedent.

WHEREFORE, Plaintiffs Thompson and Decoteau pray that judgment for compensatory damages be entered against the Defendant as provided for under the North Carolina Wrongful Death Statute together with interest, costs, attorneys' fees and other relief as may be appropriate.

## COUNT IV:  PUNITIVE DAMAGES

65.      Plaintiffs incorporate and reassert ¶¶ 1-64 above as if set forth fully herein.

66.      As set forth in detail above, the Defendant engaged in acts and/or omissions that were not merely negligent, grossly negligent or in violation of its contract, but which were egregious, malicious and/or in conscious, willful or wanton disregard or indifference for the rights, security and safety of others and of such a nature that the Defendant knew or reasonably should have known would likely result in injury, damage or harm.

67.      For such misconduct, Defendant MEP is subject to liability for punitive damages under North Carolina General Statutes § 1D-1, *et seq.*  As a direct and proximate result of the Defendant MEP's egregious misconduct, the Plaintiffs and their decedent's beneficiaries suffered

grievous loss and damages.  Consequently, the Plaintiffs hereby assert their claims for the award

of punitive damages pursuant to North Carolina General Statutes § 1D-1, *et seq.*

WHEREFORE, the Plaintiffs pray that judgment for punitive damages be entered against

the Defendant as provided for under North Carolina General Statutes § 1D-1, *et seq.* together

with interest, costs, attorneys' fees and such other relief as may be appropriate.

## COUNT V:  LOSS OF CONSORTIUM

68.     Plaintiffs incorporate and reassert ¶¶ 1-67 above as if set forth fully herein.

69.     As set forth in detail above, the Defendant engaged in acts and/or omissions and

violations of its contract that render it liable to the Plaintiffs for compensatory damages.

70.     As a direct and proximate result of the Defendant's misconduct and resulting

permanent physical and emotional injuries to Plaintiff Thomas Russell, his wife and minor

children have suffered, and continue to suffer, loss of consortium.

71.     Together with Plaintiff Thomas Russell as father and next friend of his minor

children SKR, ATR and ARR, the Plaintiff Tina Russell, individually and on behalf of her minor

children ATR and ARR, hereby assert claims for loss of consortium as follows:

a.     For the minor children SKR, ATR and ARR, Plaintiffs seek full and fair recovery
for the loss of their father's services, society, companionship, affection,
protection, care, assistance, comfort, guidance and kindly offices, among other
things; and

b.     For herself, Plaintiff Tina Russell seeks recovery for the loss of her husband's
services, society, companionship, sexual gratification, affection, protection, care,
assistance, comfort, guidance and kindly offices, among other things.

WHEREFORE, Plaintiff Thomas Russell, as father and next friend to his minor child, SKR, and, together with his wife, Plaintiff Tina Russell, individually and on behalf of their minor children, ATR and ARR, pray that judgment be entered against the Defendant in amounts that will fairly and adequately compensate the Plaintiffs for their loss of consortium and award all other recoverable damages together with interest, costs, attorneys' fees and such other relief as may be appropriate.

### PLAINTIFFS' DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on each claim asserted and on each defense so triable.

The Plaintiffs,
By Their Attorneys,

*/s/ Bradley M. Henry*
*/s/ Leo V. Boyle*
_____

Bradley M. Henry, *BHenry@MeehanBoyle.com*
Leo V. Boyle, *LBoyle@MeehanBoyle.com*
Michael B. Bogdanow, *MBogdanow@MeehanBoyle.com*
MEEHAN, BOYLE, BLACK & BOGDANOW, P.C.
Two Center Plaza, Suite 600
Boston, MA 02108-1922
617-523-8300
(*pro hac vice* motions will be promptly submitted)

AND

*/s/ Wade E. Byrd*
_____

Wade E. Byrd, *WByrd@WadeByrdLaw.com*
LAW OFFICES OF WADE E. BYRD, P.A.
232 Person St.
Fayetteville, NC 28301-5734
866-508-3689
North Carolina Bar No. 5534

DATED: 11 July 2011